**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

NORMAN DEAN,

               Plaintiff,

vs.

CHEROKEE INSURANCE
COMPANY, ROYAL TRUCKING
COMPANY, and PHILIP ARTHUR
CAIN,

               Defendants.

CIVIL ACTION
FILE NO. 1:18-cv-04914-WMR

**BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT
BRYCE ANDERSON, PhD**

COMES NOW Plaintiff Norman Dean and hereby files his brief in support of his motion to exclude the testimony of Defendants' expert Bryce Anderson and shows the Court as follows:

### I.     FACTUAL BACKGROUND

This case involves a tractor-trailer collision that occurred at approximately 11:55 a.m. on October 26, 2016 on Highway 61 in Carroll County, Georgia. Defendant Philip Cain was operating a Royal Trucking tractor-trailer on Highway 61 southbound in Carroll County, Georgia. At about the same time, Plaintiff Norman

Dean was operating his sedan on Highway 61 Southbound in the lane to the left of Defendant Cain's vehicle.

At some point, Defendant Cain attempted to merge to the left lane so that he could get on I-20 eastbound. (**Exhibit #1**, Deposition of Defendant Cain, p. 42, ll. 24-25; p. 43, ll. 1, p. 45, ll. 1-23)  As a result of this maneuver, Defendant Cain struck the passenger's side of Plaintiff Norman Dean's car causing moderate damage from the front passenger side fender to the rear passenger side quarter panel, including tearing through the front passenger tire. (See **Exhibit #2** Accident Report). Plaintiff Norman Dean reported low back pain to the investigating officer at the scene of this collision and went to Tanner Medical Center emergency room later that same day. Plaintiff Dean sustained injuries and aggravated a prior condition to his lower back in this collision that has now required a posterior lumbar fusion surgery. (**Exhibit #3,** Deposition of Treating Neurosurgeon Christopher Tomaras, MD, p. 60, ll. 21-25, p. 61, ll. 1-6, ll. 10-14)

Defendant Cain admits that at the time this wreck happened, he was in the middle of a merge maneuver trying to get in the left lane. (Exhibit #1, Deposition of Defendant Cain, p. 42, ll. 24-25; p. 43, ll. 1, 9-16) Defendant Cain was assigned fault by the Villa Rica police officer for misjudged clearance; Plaintiff Norman Dean was

assigned no contributing factor in causing the wreck. (Exhibit #2, Accident Report) Defendant Royal Trucking Company deemed this wreck to be preventable on the part of Defendant Cain. (**Exhibit #4**, Deposition of Royal Trucking Director of Safety Compliance & Risk Chris Makamson, p. 52, ll. 11-17) Defendants in each of their defensive pleadings have denied liability. (**Exhibit #5**, See Answers, para 14, 15, and 16)

<u>Designation of Bryce Anderson as an Expert & His Testimony</u>

Bryce Anderson, PhD is an engineer for a company called Anderson Consulting, LLC and is a proffered expert in the area of industrial engineering. (**Exhibit #6**, See Letter Report CV, p. 17) He performed what he termed "photogrammetric analysis" on the photos of Mr. Dean's sedan to create a figure of acceleration and force. (**Exhibit #7,** see Deposition of Bryce Anderson, p. 32, ll. 20-25; p. 33, ll. 1-4, 21-25, p. 34, ll. 1-2)[1]

Mr. Anderson was first contacted by defense counsel on May 21, 2018 to be retained as an expert in this case. (Exhibit #7, Deposition of Anderson, p. 22, ll. 11-13) Defendants did not provide notice to Plaintiff that Bryce Anderson was an expert until January 13, 2020 which was over sixteen (16) months after initially retaining

---

[1] A miniscript of Bryce Anderson PhD's deposition has been provided in its entirety

him. (**Exhibit #8**, See Defendant's 1st Supplemental Disclosure Doc 54-1)   Mr. Anderson submitted his final report to defense counsel on December 20, 2019, and the defense did not produce the report or designate Anderson as an expert until over three (3) weeks later on January 13, 2020. (Exhibit #7, Deposition of Anderson, p. 23, ll. 21-13; p. 25, ll. 11-25; p. 26, ll. 1-15)   Defendants did not provide Plaintiff with Dr. Anderson's expert report until just eleven (11) days before the expiration of the extended discovery period.[2] (Exhibit #7, Deposition of Anderson, p. 27, ll. 2-7)

Dr. Anderson generated multiple opinions about the acceleration, sufficiency of force to cause Norman Dean's injury, and the avoidability of this wreck. (Exhibit #7, Deposition of Anderson, p. 86, ll. 9-23; p. 88, ll. 3-12, p. 92, ll. 22-25, p. 93, ll. 1-7) Anderson reaches most of his opinions relying on a methodology that involves reviewing photographs, documents produced in discovery, reading depositions and talking with Defendant Cain on the phone:

> Q     And you, ultimately, intend to assist the jury by reading deposition testimony and looking at the same photos they can look at?
>
> MR. BINGHAM:     Object to form.
>
> THE DEPONENT:     Not reading -- not reading deposition testimony, but performing a kinematic

---

[2] The already extended discovery period concluded on January 24, 2020

> analysis that you can then use in conjunction with reading the deposition testimony.

> Q   A kinematic analysis that's derived from deposition testimony and photos; right?

> A   But also supported by numerical analysis.

> Q   But I'm talking about the actual evidence in the case, that you derived it from photos, deposition testimony, and a statement from the driver; right?

> MR. BINGHAM:   Object to the form.

> THE DEPONENT:   The photos of the Mercedes -- and the relative speed differential of the Mercedes -- to the tractor-trailer.

> Q   But I'm talking about -- the actual hard evidence in the case: Testimony, photographs, and statements from Defendant Cain; right?

> A   Yes.  In my analysis, yes.

> Q   That's what you predicated your analysis upon; right?

> A   With the photos being primarily with those and the speed differential, yes.

(Exhibit #7, Deposition of Anderson, p. 64, ll. 9-25; p. 65, ll. 1-16)

Dr. Anderson's opinions related to force and acceleration were virtually all the product of a methodology he called 'photogrammetric analysis.'

> Q   What analysis did you perform on the deformations other than looking at them?

> A   That's all you need to do.

> Q   You just look at them and perform analysis?

> A      It's a photogrammetric analysis.

(Exhibit #7, Deposition of Anderson, p. 33, ll. 21-25)

Dr. Anderson was unable to testify as to whether there is any general acceptance of this purported methodology:

> Q      Are there any peer reviewed type of methods out there that -- that you relied upon in your conclusions in this case?
>
> A      Well, certainly in looking at force required to deform metal, there's -- that's an accepted methodology for determining force and energy in any field.
>
> Q      Is looking at a photo and determining the deformity amount a generally accepted methodology for determining force and acceleration?
>
> A      Well, your question is compound, and you're skipping a few steps in there.  A photogrammetric analysis certainly is viable to determine depths and areas and shapes of damaged areas.· Then you can -- once you have that, you can use scientific methodology to determine forces and energy. So it's not like you're looking at the photograph and saying, oh, this is X amount of force or X amount of energy.· You can't just look at a photograph and do that.

(Exhibit #7, Deposition of Anderson, p. 35, ll. 8-25; p. 36, ll. 1-2)

Dr. Anderson was sure there was scientific literature that supported his methodology but none that he had personally reviewed:

> Q      Any scientific literature that supports the photogrammetric analysis that you performed in this case?
>
> A      I'm sure there is.

> Q     Are you aware of any?
>
> A     I have not personally reviewed it, but it's kind of an industry standard at this point.[3]

(Exhibit #7, Deposition of Anderson, p. 36, ll. 4-10)

Dr. Anderson has not written any publications on photogrammetric analysis:

> Q     Have you ever written any articles on the photogrammetric analysis?
>
> A     No, absolutely not. No.
>
> Q     Were there any other authorities on photogrammetric analysis that you relied upon in making your conclusions in this case?
>
> A     Not to my knowledge, no.

(Exhibit #7, Deposition of Anderson, p. 37, ll. 2-8)

Dr. Anderson, who does not have a medical degree, additionally offers opinion testimony based on his calculated acceleration and force figures about the impact being insufficient to cause the lumbar disc injuries in this case:

> Q     Well, what -- what's your opinion on that?  Tell me your opinion on that acceleration and the resulting injury.
>
> A     Yeah.· Well, again, with the resulting injury, I'll leave that to the medical people.· But I can tell you that the forces that were involved were very low.· They certainly didn't rise to the level of the strength of collagen or the strength of discs or the strength of the biomechanic tissue that -- that we have injured in this crash.

---

[3] Dr. Anderson also testified that a graduate school classmate Laurel Shields wrote her dissertation on photogrammetric analysis, but he did not indicate that he had reviewed it. (See Exhibit #7, Deposition of Bryce Anderson, p. 36, ll. 11-22)

(Exhibit #7, Deposition of Anderson, p. 88, ll. 3-12)

Dr. Anderson testified that he has education and training about the sufficiency of impacts to cause a lumbar disc herniation, but he has not done any such 'kinematic analysis' in this case:

> Q       Do you have any education or training about the sufficiency of impact that would cause a lumbar disc herniation?
>
> A       Well, certainly.  You can do a kinematic analysis and figure out what injury thresholds are for disc herniation if you know the disc herniation strength and strength of materials there.
>
> Q       When you say you can do, what actual education and training do you have on the force of an impact causing a lumbar disc herniation or not causing one?
>
> A       Sure.  Well, that's a specific case. But I have had, certainly, training and coursework in determining what forces can be produced in a car crash that can produce forces on human tissue. For example, breaking bones or tearing ligaments or -- certainly doing that.· I have not done that analysis here.

(Exhibit #7; Deposition of Anderson, p. 86, ll. 25, p. 87 1-17)

Additionally, the only testing that Dr. Anderson has performed on this methodology involves the force of projectiles like bullets into the bones of cadavers, and not the force of motor vehicle collisions on spinal disc material. (Exhibit #7; Deposition of Anderson, p. 88, ll. 13-25, p. 89, ll. 1-7)

Dr. Anderson was unable to provide any scientific authority for his peak acceleration calculation other than reasserting his own conclusion that "Again, the acceleration is very, very low."

> Q    Okay.  And it says, The peak acceleration in this event would have been less than .644 feet per second squared; is that correct?
>
> A    Correct. Yes.
>
> Q    And generate forces commensurate with normal driving and vehicle operation, which would be very low and would not be possible to cause the type of injuries attributed to this sideswipe event?
>
> A    Correct.  Exactly.
>
> Q    **What scientific authority do you base that opinion on?**
>
> A    **Again, the acceleration is very, very low.**  What we're talking about here produces forces.· On Mr. Dean's torso, it would have been around 2.9 pounds.

(Exhibit #7; Deposition of Anderson, p. 56, ll. 12-25, p. 57, ll. 1)[Emphasis supplied]

Dr. Anderson predicated his other opinions regarding both Plaintiff Norman Dean and Defendant Cain's ability to avoid the wreck on the acceleration and force calculations derived from the photogrammetric analysis. Dr. Anderson agrees that Mr. Dean was in his own lane of travel and that Defendant Cain was in the middle of a merge maneuver at the time of this wreck. (Exhibit #7, Deposition of Anderson, p. 66, ll. 10-13; p. 70, ll. 22-25, p. 71, ll. 1-25, p. 72, ll. 1) However, he opines that

Norman Dean was the striking vehicle and could have done more to avoid this collision. (Exhibit #7, Deposition of Anderson, p. 67, ll. 15-18; p. 92, ll. 22-25, p. 93, ll. 1-2)

## II.     ARGUMENT & CITATION OF AUTHORITY

The Court has broad discretion in excluding expert testimony based on the timeliness of the disclosures under Local Rule 26.2C and Federal Rule of Civil Procedure 37(c)(1). The Court also has broad discretion in excluding expert testimony based on the relevance and reliability of the opinion. <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### A. <u>Defendants Did Not Designate Bryce Anderson, PhD Sufficiently Early in Discovery Period to Allow Plaintiff to Name Its Own Rebuttal Engineering Expert</u>

Federal Rule of Civil Procedure 26 provides that expert disclosures must occur at the times and in the sequence that the Court orders. Fed. R. Civ. P. 26(a)(2)(C). This Court's Local Rules set forth the following guidelines regarding the disclosure of expert witnesses:

> Any party who desires to use the testimony of an expert witness shall designate the expert witness sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, **if desired, to name its own expert witness sufficiently in advance of the close of discovery** so that a similar discovery

- 10 -

> deposition of the second expert might also be conducted
> prior to the close of discovery. **Any party who does not
> comply with the provisions of the foregoing paragraph
> shall not be permitted to offer testimony of the party's
> expert**, unless expressly authorized by court order based
> upon a showing that the failure to comply was justified.
> LR 26.2C, ND Ga [Emphasis supplied]

Here, Defendants did not provide notice to Plaintiff that Bryce Anderson PhD was

an expert until January 13, 2020 which was over sixteen (16) months after initially

retaining him. (Exhibit #8, See Defendant's 1st Supplemental Disclosure Doc 54-1)

Defendants waited until only eleven (11) days remained in the extended discovery

period to designate Dr. Anderson as an expert and produce his expert report. (Exhibit

#7, Deposition of Bryce Anderson, p. 27, ll. 2-7). This was a final expert report that

Defendants' counsel had in their possession for over three (3) weeks before

designating Dr. Anderson as an expert and producing the report. (Exhibit #7,

Deposition of Bryce Anderson, p. 23, ll. 21-13; p. 25, ll. 11-25; p. 26, ll. 1-15)

In doing so, the defense made it a virtual certainty that Plaintiff would be

unable depose this expert and make a timely determination as to whether to retain

and designate his own rebuttal engineering expert. Designating expert witnesses less

than two weeks before the expiration of the (already extended) discovery period

completely runs afoul of the requirement that expert witnesses be designated

"sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert." LR 26.2C, NDGA

The Defendants' failure to take the steps to designate him and any others in a proper manner as expert witnesses earlier in the discovery period cannot be excused. See APA Excelsior III, L.P. v. Windley, 329 F. Supp. 2d 1328, 1338 (N.D. Ga. 2004) (finding no justification for a party's failure to designate in a timely fashion an expert witness where the party was on notice during discovery that the expert testimony would be needed). On this basis alone, the Defendants should not be allowed to offer Dr. Anderson's testimony as an expert at trial. He should be excluded.

**B. Anderson's Testimony is Inadmissible Under FRE 702 and The Daubert Standard**

FRE 702 governs the admissibility of expert testimony in civil cases. Section 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The trial court acts as a gatekeeper, "assessing both the witness' qualifications to testify in a particular area of expertise and the relevancy and reliability of the proffered testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999)

In determining the admissibility of expert testimony under FRE 702 and Daubert "a trial court must assess three aspects of proposed expert testimony — the qualifications of the expert, the reliability of the testimony, and the relevance of the testimony — to discharge its responsibilities as a gatekeeper." McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004). Further, Defendants must prove Anderson is qualified, that his testimony is reliable, and that his testimony would be helpful to the jury. United States v. Frazier, 387 F3d 1244, 1260 (11th Cir. 2004)

In this case, Anderson's testimony is inadmissible because his methodology is not reliable and he is not qualified to testify about medical causation and under FRE 702 and Daubert.

### 1.  Anderson's Methodology is Not Reliable

In determining whether expert testimony is reliable under <u>Daubert</u>, the trial Court must consider whether "the methodology by which the expert reaches his conclusions is sufficiently reliable." <u>Seamon v. Remington Arms Co., LLC</u>, 813 F3d. 983, 988 (11th Cir, 2016). Courts should consider the following factors in evaluating the reliability of expert testimony:

1.  Whether the theory or technique employed by the expert is generally accepted in the scientific community;

2.  Whether it has been subjected to peer review and publication;

3.  Whether it can be and has been tested;

4.  Whether the known or potential rate of error is acceptable; <u>Daubert</u> at 593, 594.

Here, Anderson testifies that the photogrammetric methodology he used in determining depth and shapes of damaged areas on photos is "viable" but he does not testify to its general acceptance. (Exhibit #7, Deposition of Anderson, p. 35, ll. 8-25; p. 36, ll. 1-2)  Dr. Anderson never did any measurements or inspections on the actual vehicles, and claims that is because Plaintiff did not preserve his vehicle. (Exhibit #7, Deposition of Anderson, p. 107, ll. 15-24) Plaintiff made his vehicle

available for months after this collision as he was attempting to have Defendant Cherokee Insurance process his property damage claim. (See **Exhibit #9**; October 28, 2016 Letter of Representation)

With regard to his methodology of photogrammetric analysis being peer reviewed or published, Dr. Anderson himself has not written any articles on it and could not specifically recollect of any scientific authorities that he relied upon in generating his opinions. (Exhibit #7, Deposition of Anderson, p. 37, ll. 2-8)  When asked if any scientific authority supported his acceleration and force calculations, Dr. Anderson simply reiterated that his calculations showed the 'acceleration was very, very low' (Exhibit #7; Deposition of Anderson, p. 56, ll. 12-25, p. 57, ll. 1)

The only testing that Dr. Anderson has done related to the biomechanical aspect of his opinions involved projectile forces of bullets on hard tissues in cadavers. (Exhibit #7; Deposition of Anderson, p. 88, ll. 13-25, p. 89, ll. 1-7)  This is completely inapplicable to his conclusions on the  sufficiency of force for an auto collision to cause a lumbar disc herniation.

Dr. Anderson produced no error rates in his expert report, and provided no support for the accuracy of his conclusions.  All of Dr. Anderson's conclusions

regarding the avoidability of this collision are all predicated on the calculations generated from the unreliable photogrammetric methodology.

While an expert's opinion is not rendered inadmissible just because it goes to the ultimate issue, an expert cannot provide an opinion that is not helpful to the trier of fact or tell the jury what conclusion to reach. "The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rule 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for an exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach." Advisory Committee Notes to F.R.E. 704. Dr. Anderson has no unique knowledge about the evidence in this case and has nothing to offer to a jury beyond the evidence they will weigh at trial.

Anderson's testimony is the precise type of untestable, unreliable data that Daubert and the Federal Rules of Evidence were designed to exclude from evidence at trial. While it is true that cross-examination can effectively expose a weak expert opinion, the Court cannot allow an expert to testify when there is no discernable process or reliable method by which the expert's opinion was generated. Ward v. Shoney's, Inc., 847 A.2d 367 (Del. 2002).

Anderson's methodology is not reliable and must be excluded.   Plaintiff moves to exclude Anderson's testimony because it does not meet the standard set under FRE 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> for admissibility.

## 2.    Anderson is Not Qualified to Give Opinions on Specific Medical Causation

Dr. Anderson admits he has no formal medical education or training in the area of diagnosing injuries. (Exhibit #7, Deposition of Anderson, p. 91, ll. 1-20). However, he offers the following opinions directly pertaining to the diagnoses of Plaintiff Dean's injuries:

> Without a change in velocity to provide a significant acceleration, there is no resultant force generated that would be expected to cause injury to the structures of the human body that would be consistent with Mr. Cain's diagnoses… Without significant forces applied to the occupant, there is no foundation for lumbar spinal damage, the cervical disc displacement, the disc slippage in the cervical vertebrae, or the left leg pain that are alleged to have arisen from the subject event.

(See Exhibit #6, Letter Report. p. 11)

Under a similar set of circumstances, the Middle District of Georgia outlined the appropriate parameters for biomechanical testimony in an Order issued in <u>Bowers v. Norfolk Southern Corp</u>, 537 F. Supp.2d 1343 (MD Ga. 2007):

> "Biomechanical engineers ordinarily are not permitted to give opinions about the "precise cause of a specific

> injury." <u>Smelser v. Norfolk S. Ry. Co.</u>, 105 F.3d 299, 305
> (6th Cir. 1997) see also Yarchak, 208 F. Supp. 2d at 501
> (admitting the general causation testimony of a
> biomechanical engineer and noting that the engineer did
> "not offer any clinical or medical opinions with respect to
> the specific medical cause or source of Plaintiff's
> [injuries]"). This is because biomechanical engineers lack
> the medical training necessary to identify the different
> tolerance levels and preexisting medical conditions of
> individuals, both of which "could have an effect on what
> injuries resulted from an accident." <u>Smelser</u>, 105 F.3d at
> 305. See <u>Bowers</u>, 537 F. Supp at 1377

Here, Dr. Anderson's report provides the precise type of specific medical causation opinion reserved for qualified medical experts. In addition to the unreliable photogrammetric analysis he uses as his methodology, Dr. Anderson is not qualified to provide the medical causation opinions that flow from his force and acceleration calculations.

## CONCLUSION

Accordingly, and for the foregoing reasons, Plaintiff respectfully requests that the Court exclude from trial the testimony of defendant's expert Bryce Anderson Ph.D.

This the 20th day of April, 2020.

Respectfully Submitted,

**THE HOUGHTON LAW FIRM, LLC**

By /s/ John A. Houghton
**JOHN A. HOUGHTON**
Georgia Bar No. 118206
*Attorneys for Plaintiff*

2860 Piedmont Road, NE
Suite 250
Atlanta, Georgia 30305
Phone: (404) 549-3006
Fax: (404) 592-6471
john@houghtonlawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day of April 20, 2019 electronically filed the foregoing BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERT BRYCE ANDERSON Ph.D. with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Jeffrey W. Melcher, Esq.
W. Shawn Bingham, Esq.
Eleanor Jolley, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
One Atlanta Plaza
950 East Paces Ferry Road, NE
Suite 2850
Atlanta, Georgia 30326
*Counsel for Defendants*

This 20TH day of April, 2020

THE HOUGHTON LAW FIRM, LLC

By: */s/ John A. Houghton*
**JOHN A. HOUGHTON**
Georgia Bar No. 118206

2860 Piedmont Road NE, Suite 250
Atlanta, Georgia 30305
Phone: (404) 549-3006
Fax: (404) 592-6471
john@houghtonlawfirm.com

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing complies with the font and point selections approved by the Court in Local Rule 5.1B.  This motion has been prepared in Times New Roman font, 14 point, doubled-spaced, with a top margin of not less than 1.5 inches and a left margin of not less than 1 inch.

This 20TH day of April, 2020

THE HOUGHTON LAW FIRM, LLC

By: */s/ John A. Houghton*
**JOHN A. HOUGHTON**
Georgia Bar No. 118206

2860 Piedmont Road NE, Suite 250
Atlanta, Georgia 30305
Phone: (404) 549-3006
Fax: (404) 592-6471
john@houghtonlawfirm.com